UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------- X

CAVEL MARAGL o/b/o D.S.P.,

**MEMORANDUM & ORDER**

                  Plaintiff,

13-CV-2435(KAM)

     -against-

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                  Defendant.

--------------------------------------- X

**MATSUMOTO, United States District Judge:**

        Pursuant to 42 U.S.C §§ 405(g) and 1383(c)(3),
plaintiff Cavel Maragl ("plaintiff"), on behalf of her minor
daughter, D.S.P. ("claimant"), appeals the final decision of
defendant Acting Commissioner of Social Security Carolyn W.
Colvin ("defendant" or the "Commissioner") denying claimant's
application for Supplemental Security Income ("SSI") benefits
pursuant to Title XVI of the Social Security Act (the "Act".)
Plaintiff, who is represented by counsel,[1] argues that she is
entitled to receive SSI benefits on behalf of her daughter due
to her daughter's severe medically determinable impairments,
including asthma and learning disabilities, that render her
disabled. (*See generally* Compl.) Presently before the court

---

[1] Plaintiff filed her complaint *pro se* but has since obtained counsel. (*See*
ECF No. 1, Complaint ("Compl.") dated 4/19/13; Notice of Appearance dated
9/9/13.)

are the parties' cross-motions for judgment on the pleadings.[2]
In the alternative, plaintiff seeks remand for further
administrative proceedings. (*See* ECF No. 19, Defendant's Motion
for Judgment on the Pleadings ("Def. Mem.") dated 9/16/13; ECF
No. 16, Plaintiff's Motion for Judgment on the Administrative
Record and Pleadings ("Pl. Mem.") dated 11/8/13.) For the
reasons set forth below, the defendant's motion is denied, the
plaintiff's motion is granted in part and denied in part, and
the case is remanded for further proceedings consistent with
this opinion.

**BACKGROUND**

## I.    Claimant's Personal History

Claimant was born on January 31, 1999 and was twelve
years old and in the sixth grade at the time of the ALJ hearing.
(Tr. 31.)[3] She lives with her mother, 21 year-old brother, and 7
year-old sister. (Tr. 38-39.) Claimant had previously repeated
the fourth grade before being promoted to sixth grade (Tr. 161,
271.) She started sixth grade at a new school and had not yet
received a report card from the new school at the time of the
hearing. (Tr. 32.) Claimant received speech therapy at school,
starting in approximately 2009, to address a stutter as part of

---

[2] As discussed *infra*, plaintiff and defendant each submitted a motion for
judgment on the pleadings but did not file memoranda to oppose each other's
motions.

[3] Citations to the administrative record (1-523) are indicated by the
abbreviation "Tr."

her Individualized Education Program ("IEP"). (Tr. 32-35.)
Claimant testified that the speech therapy was helpful to her.
(Tr. 48.)  Claimant had been in a Special Education class in her
old school, but was not in Special Education classes at her new
junior high school at the time of the hearing. (Tr. 42.)

Plaintiff was not aware of claimant having any
behavioral problems at school, but noted that she would
frequently fight at home with her siblings, both verbally and
physically. (Tr. 38-39, 40-41.) Claimant testified that she
enjoyed playing with her friends, riding bikes, and playing on
the computer. (Tr. 44-45.) She also reported getting into "play
fights" and physical fights with her friends. (Tr. 46-47.)
However, claimant testified that she did not ever get in trouble
at school other than for talking during class. (*Id.*)

Plaintiff reported that claimant was attending therapy
starting in June or July of 2011, approximately four months
prior to the hearing, for unspecified behavioral problems.  (Tr.
37.)  Plaintiff also reported that claimant had problems with
her blood pressure, for which she was under medical care.  (Tr.
38.)

At the hearing, the ALJ noted that claimant's eyes
were puffy.  (Tr. 49.)  Plaintiff reported that claimant was
being tested for kidney problems, and that doctors had mentioned
that the puffiness may be related to claimant's high blood

pressure. (Tr. 49-50.) Claimant takes medication for her blood

pressure twice a day, as well as medication for bed wetting.[4]

(Tr. 50-53.) Plaintiff reported that claimant suffered from

sleep apnea, and that she was in a coma when she was born, which

doctors mentioned might cause developmental delays. (Tr. 53-

54.) Plaintiff also testified that claimant is slow to respond

when asked questions by other people. (Tr. 54-55.)

On the Function Report submitted with claimant's

application for benefits, plaintiff indicated that claimant had

problems talking clearly, and that her speech could only be

understood by others "some of the time." (Tr. 148.) Plaintiff

also reported that claimant's ability to communicate was not

limited (Tr. 149), but that her ability to progress in learning

was limited because she attends a special speech class. (Tr.

150.) In the section of the form for supplemental remarks,

plaintiff stated that "sometimes when [claimant] is asked a

question, she can't answer it for a while, or can't explain

herself." (Tr. 155.)

On a questionnaire completed by plaintiff on November

4, 2010, plaintiff wrote that claimant sometimes stuttered and

was unable to explain herself, and that she was left back in the

---

[4] Undated documentation submitted by plaintiff indicates that claimant takes
enalapril for high blood pressure, desmopressin for bedwetting, and a
Proventil inhaler and Singulair for asthma. (Tr. 174-77.)

fourth grade and pulled out from her regular classroom three times a week.[5] (*See* Tr. 161.)

In an undated Disability Report submitted on appeal, plaintiff reported that claimant's condition had worsened since her initial application for benefits in October 2010, and that she was suffering from constant bedwetting, nervous disposition, and an inability to respond to verbal commands or take part in conversations. (Tr. 162.) The report indicated that claimant was generally withdrawn and easily frightened after having been sexually molested by a family friend at the age of five.[6] (*Id.*) Claimant was prescribed treatment for asthma at the time and needed assistance and reminders to take care of her personal needs. (Tr. 164-65.)

## II.  Claimant's Medical History

### A. Kings County Hospital Center Records

Records from the Kings Country Hospital Center (KCHC) pediatric clinic indicate that claimant remained hospitalized for three months after her birth for complications arising from meconium aspiration, a condition in which a fetus or newborn breathes meconium (feces) into her lungs. (Tr. 201; *see also*

---

[5] Although plaintiff did not specify the reasons for D.S.P.'s regular removal from her classroom, other documents in the record indicate that D.S.P. was pulled out of her general education classroom to receive small group speech therapy services. (*See, e.g.*, Tr. 249.)

[6] Letters from Safe Horizon's office at the Brooklyn District Attorney's office indicate that the perpetrator was charged with the crime on July 24, 2004, and that there was a seven-year order of protection for claimant against the perpetrator. (Tr. 170-71.)

http://www.nlm.nih.gov/medlineplus/ency/article/001596.htm (last visited Jul. 29, 2015).)  At a March 14, 2008 checkup, claimant was diagnosed as obese but was otherwise normal.  (Tr. 201-203.)

In May 2008, claimant was hospitalized with pneumonia for 17 days after experiencing difficulty breathing, fever, and loss of appetite for several days.  (*See* Tr. 190-200; *see also* Tr. 228-31.)  She was treated with antibiotics and developed high blood pressure, which later abated, over the course of her hospital stay.  (*Id.*)  Claimant had a follow up appointment on June 25, 2008, at which plaintiff reported that claimant had been well and had not suffered from fevers, headaches, cough, shortness of breath, difficulty breathing, vomiting or diarrhea since her discharge. (Tr. 204-205; *see also* Tr. 232-34.)  Dr. Michel noted that D.S.P. was clinically improved, would continue her course of antibiotics, and come in for a follow-up appointment with pediatric nephrology.  (*Id.*)  Her blood pressure was recorded as 128/84.  (*Id.*)  Claimant returned to the pediatric chest clinic on July 23, 2008, at which time plaintiff reported no other issues, and that claimant was "herself again." (Tr. 210.)  Notes from an October 2008 checkup indicated that claimant was asymptomatic for pneumonia.  (Tr. 211-213.)

On June 27, 2008, claimant visited the KCHC pediatric renal clinic for hypertension/intermittent high blood pressure.

6

(Tr. 206.)  At the time, claimant did not complain of headaches, blurry vision, palpitations, diaphoresis, edema, or urinary symptoms.  (*Id.*)  Plaintiff told Dr. Ngai that claimant ate a lot of junk food, and that plaintiff cooked with corn oil and salt most of the time.  (*Id.*)  A renal ultrasound administered that day was normal.  (Tr. 234-36.)  Claimant was diagnosed with benign essential hypertension.  (Tr. 208.)

In April 2009, claimant returned to the KCHC pediatric clinic after experiencing a cough for one week.  (Tr. 217.)  She was diagnosed with asthma and nocturnal enuresis (bedwetting).  (Tr. 218-21.)  Plaintiff was advised to discontinue fluids prior to claimant going to bed, and claimant was referred for a urology evaluation.  (*Id.*)  The visit notes indicated that albuterol, Proventil, and Singulair would be prescribed for claimant's asthma.  (*See* Tr. 221.)  Claimant returned to the clinic in May 2008 for a follow-up visit, during which she reported a persistent cough after non-compliance with her treatment plan.  (Tr. 223.)  Dr. Browne advised plaintiff about the importance of compliance with claimant's asthma treatment.  (*Id.*)  A June 2009 chest x-ray showed signs suggesting possible reactive airway disease.  (Tr. 237-38.)

At claimant's September 2009 follow-up visit, Dr. Browne diagnosed her with unspecified rhinitis (allergies) and

re-advised her to decrease her intake of high-calorie and fatty foods. (Tr. 225.)

On April 1, 2011, Dr. Browne referred claimant to the pediatric behavioral health center for an evaluation after noting that claimant was "failing,"[7] had an increased fright response, and was pulling her sister's hair. (Tr. 315.)

On July 1, 2011, Dr. Swati Mehta referred claimant for a renal consultation and echocardiogram after diagnosing claimant with benign essential hypertension. (Tr. 316-17.) After visiting the renal clinic on August 26, 2011, claimant was admitted to the Pediatric Intensive Care Unit due to high blood pressure.[8] (Tr. 348-53; *see also* 355-485.) The discharge summary indicated that claimant was not in distress and was otherwise asymptomatic (e.g., no headaches, vision problems, vomiting, or nosebleeds) at the time she was admitted. (*Id.*) During her admission, she was administered 5 milligrams of enlapril and one dose of hydralazine, and her blood pressure stabilized. (Tr. 350.) The renal, endocrine, and ophthalmology departments were consulted in order to determine the source of claimant's hypertension. (*See* Tr. 350-51.) Claimant's ophthalmology consultation reported no findings of hypertensive

---

[7] The visit report does not specify whether was failing in school or some other realm of functioning.

[8] Pages 359 to 485 of the administrative record are additional reports, notes, and records from claimant's August 26-31, 2011 hospitalization for hypertension.

retinopathy and recommended strict blood pressure control and a follow up slit lamp examination. (Tr. 350-51.) The pediatric renal and endocrine consultations also recommended follow up testing to rule out various pathologies. (*Id.*) On August 31, 2011, claimant was discharged in stable condition with no restrictions on her activity. (Tr. 353.) Numerous follow-up appointments and a sleep study were scheduled for the following month. (Tr. 351, 353.)

Claimant had a follow-up appointment with Dr. Browne on September 2, 2011, at which Dr. Browne re-advised plaintiff that she needed to strictly adhere to restricting claimant's salt intake and keeping all future appointments. (Tr. 517-19.) On September 16, 2011, claimant was seen by Dr. David Rand in the ophthalmology department, during which no evidence of intraocular pathology was observed. (Tr. 513-14.) She was also seen by Dr. Amrit Bhangoo in the endocrinology department that day. (Tr. 515-16.) Although it was noted that claimant had gained weight and was presently overweight, Dr. Bhangoo ruled out Cushing's syndrome and reported normal adrenocorticotropic hormone and cortisol levels. (Tr. 516.)

On September 23, 2011, claimant visited the pediatric renal department and was referred for a sonogram. (Tr. 509-12.) Dr. Sophia Morriseau noted that claimant's bedwetting medication could be contributing to her hypertension, but noted that the

hypertensive symptoms went back to 2008 and a renal sonogram at that time was within normal limits. (Tr. 510.) On September 30, 2011, claimant returned to the renal clinic for an ultrasound to rule out any renal diseases that might be causing her hypertension. (*See* Tr. 502.) The ultrasound revealed normal echogenicity and no renal stones, soft tissue masses, or renal cysts. (Tr. 502-503.) That same day, claimant visited Dr. Browne for a follow-up examination. (*See* Tr. 504-507.) Dr. Browne reported that claimant was forgetting to take her medication and continuing to eat chips and Chinese food. (Tr. 506.) Dr. Browne re-advised claimant and plaintiff to comply with claimant's medication regimen and to decrease her intake of high calorie, fat, and salt foods. (*Id.*)

B. Child's General Asthma Report

Dr. Browne completed a Child's General Asthma report dated July 6, 2011, in which she noted that claimant was first diagnosed with asthma in 2009 and was currently diagnosed with moderate asthma. (Tr. 328.) She reported that claimant suffered from episodic wheezing, triggered by changes in weather, smoke, and dust, and that allergens, temperature, stress, and respiratory infections all triggered her asthmatic symptoms. (Tr. 329.) Dr. Browne described claimant's asthma attacks as intermittent and lasting one to two days, if treated. (Tr. 330.) Dr. Browne noted that claimant only required emergency

treatment for her asthma on one occasion in July 2009.  (*Id.*)
She wrote that claimant was compliant with her treatment regimen
of albuterol and singulair, and that the medications controlled
claimant's symptoms, although the albuterol caused increased
heart rate.  (Tr. 330-31.)  Finally, Dr. Browne observed that
claimant's asthma did not restrict her activity or limit her
ability to function in an age-appropriate manner.  (Tr. 333.)

**III. Claimant's Psychological and Educational History**

A. <u>NYC Department of Education Psycho-Educational Evaluation</u>

At plaintiff's request, Elisheva S. Gantz, M.S.,
completed a psycho-educational evaluation of D.S.P. from
September 21-23, 2009.  (Tr. 271-76.)  In general, Ms. Gantz
noted that D.S.P. was a sweet and engaging child with whom Ms.
Gantz easily established and maintained a rapport.  (Tr. 271.)
With respect to speech and language skills, however, D.S.P.
expressed disorganized thoughts, mumbled when speaking, and
needed repeated prompting in order to communicate important
information.  (*Id.*)  Ms. Gantz conducted interviews with D.S.P.
and her teacher and administered several intelligence and
language assessments.  (Tr. 272-76.)

i.   <u>Cognitive Functioning</u>

The Cognitive Functioning part of the evaluation
included an analysis of D.S.P's verbal comprehension, perceptual
reasoning, working memory, and processing speed.  (Tr. 272.)

She scored a Full Scale IQ score of 76, which placed her in the borderline range of functioning or fifth percentile.  In the area of verbal comprehension, D.S.P. demonstrated limitations organizing thoughts and ideas, and did not appear to know or understand the definitions of many words or the words' concepts. (Tr. 272.)  In the area of perceptual reasoning, D.S.P. took considerable time to match familiar objects and pictures.  (Tr. 273.)  She was also asked to replicate designs using patterned blocks; although she tried, she often did not recognize the details and had trouble integrating information.  (*Id.*)  D.S.P's strongest skills were displayed in the working memory area, which were at the low average range of functioning.  (*Id.*)  When asked to repeat numbers and information, D.S.P. had trouble recalling more than four digits and reciting numbers in backwards order.  (*Id.*)  Overall, D.S.P. had a hard time recalling a large amount of information at a given time.  (*Id.*) D.S.P. demonstrated her weakest skills in the processing speed area, with performance in the borderline range.  (*Id.*)  She had difficulty using a key to match symbols and numbers, as well as comparing and contrasting shapes and symbols.  (*Id.*)  Ms. Gantz observed that the more quickly claimant attempted to work, the more errors she made.  (*Id.*)  Overall, D.S.P.'s cognitive ability measured in the low average range, indicating delays in her intellectual and cognitive potential.  (*Id.*)

She also scored in the low average range (18th percentile) on the Bender Gestalt-II, in which she was asked to copy twelve designs onto paper. (Tr. 274.) She struggled in organizing the information and integrating details from the model drawings into her own drawings. (*Id.*) Upon recall, she was able to draw five of the twelve shapes and scored in the average range, demonstrating better organization and integration. (*Id.*)

ii. <u>Academic Functioning</u>

Claimant completed the WIAT-II assessment, which included reading, math, and writing components. (Tr. 274.) D.S.P. demonstrated reading performance at the low end of the "Low Average" range. (*Id.*) Although she could easily read simple words, she started confusing[9] words as the words became more difficult. (*Id.*) When asked to read fake words, D.S.P., no longer able to rely on familiarity, demonstrated even greater difficulty with vowel sounds. (*Id.*) She struggled to answer comprehension questions after reading sentences and passages. (*Id.*) Although she could sound out the words correctly, she had difficulty organizing the information and drawing conclusions. (*Id.*)

---

[9] For example, D.S.P read "cleanse" as "cleans" and "dozing" as "dozen." (Tr. 274.)

D.S.P. performed lower, in the borderline range, on the mathematics section of the assessment. (Tr. 275.) Although D.S.P. correctly solved basic addition and subtraction problems, she had trouble applying math concepts to word problems and was unable to solve multi-digit addition and subtraction problems. (*Id.*) Written language was D.S.P.'s strongest skill area, in which she scored in the average range. (*Id.*) She was able to write a few words on a specific topic and spell many individual words correctly. (*Id.*) Nonetheless, D.S.P exhibited mild delays in elaborating on her ideas in writing and had many run-on sentences and grammatical errors in her paragraphs, while only including minimal information. (*Id.*)

### iii. Social/Emotional Functioning

Ms. Gantz indicated that D.S.P. was a friendly girl who interacted well with peers. (Tr. 275-76.) Although she was generally cooperative in class, she sometimes engaged in arguments with other students. (*Id.*) Ms. Gantz noted that claimant's academic skills, while low to average for her age, are generally stronger when compared to other fourth graders because she had been held back one grade. (Tr. 274.) Ms. Gantz also reported that D.S.P. had difficulty accepting responsibility for her actions, evaluating her decisions, and accepting consequences, often thinking that others were at fault instead. (Tr. 276.)

B. <u>Department of Education Speech and Language Evaluation</u>

On October 9, 2009, D.S.P. completed a speech and language evaluation for her Individualized Education Program (IEP), discussed below, administered by Nicki J. Newman, M.S., T.S.H.H.[10]  (Tr. 268-70; 282-84.)  Ms. Newman observed that claimant's activity level was within normal limits, but she appeared lethargic.  (Tr. 268.)  Claimant made eye contact but did not use spontaneous language or engage in turn-taking conversation.  (*Id.*)  Although she did not ask questions or make comments, she did respond to questions when asked.  (*Id.*)  At one point, she told her mother that she was hungry.  (*Id.*)

Ms. Newman gave claimant four core subtests of the Clinical Evaluation of Language Fundamentals-Fourth Edition (CELF-4), from which a Core Language score was calculated.  (Tr. 269-70.)  The Core Language Score, considered to be the most representative measure of the subject's language skills, has a mean of 100, representing the performance of a typical student of the subject's age, and a standard deviation of 15.  (Tr. 269.)  Claimant scored a 78, which placed her in the seventh percentile and the borderline range of functioning.  (*Id.*)

_____

[10] T.S.H.H., or Teacher of Speech and Hearing Handicapped, is a voluntary certification for teachers who have completed a minimum level of credit hours in speech and language disorders and/or supervised clinic experience.  New York State Speech-Language-Hearing Association, Inc., *Speech-Language Pathology Credential Comparison*, http://www.nysslha.org/i4a/pages/index.cfm?pageid=3492 (last visited Jul. 29, 2015).

D.S.P. scored in the second percentile on the Concepts and Following Directions subtest, which evaluates a student's ability to interpret, recall, and execute oral commands. (*Id.*) On the Recalling Sentences subtest, which tests a student's ability to recall and reproduce sentences of varying length and complexity, claimant scored in the 16th percentile. (*Id.*) On the Formulated Sentences subtest, which tests the student's ability to formulate compound and complex sentences within grammatical constraints, claimant scored in the ninth percentile. (*Id.*) On the Word Classes 2 subtest, which evaluates the student's ability to understand relationships between words, claimant scored in the 25th percentile. (*Id.*)

Ms. Newman concluded that claimant's poor language memory skills were directly affecting her ability to follow oral commands, formulate sentences, and recall sentences, which in turn were having a negative impact on her ability to function at school. (Tr. 270.) Ms. Newman recommended small-group speech and language therapy twice a week. (*Id.*)

C. Claimant's Individualized Education Program

D.S.P.'s IEP dated November 20, 2009 indicated that her cognitive and intellectual abilities were in the borderline range. (Tr. 241.) She was classified as having a speech or language impairment and recommended for a general education classroom with special education teacher support and pull-out

speech therapy. (Tr. 239, 247.) Based on D.S.P.'s performance on the WISC-IV assessment, her strongest skills were in the area of working memory, in the low average range, though she sometimes struggled to retain information. (Tr. 241.) Her skills in the areas of verbal comprehension and perceptual reasoning were at the low end of the low average range, as she had difficulty expressing ideas and attending to details. (*Id.*) Her skills in the area of processing speed were the weakest, in the borderline range. (*Id.*) Claimant's strongest academic skills were in writing (average), while her skills in reading (low average) and math (borderline) were lower. (*Id.*) Her comprehension of information, including her ability to evaluate material and express herself, was poor. (*Id.*)

The IEP noted claimant's borderline to low level language skills, and specified that her poor language memory skills affected her ability to follow oral commands, formulate sentences within a specific contextual constraint, and recall sentences of increasing length and complexity. (Tr. 242.) She also suffered from reduced intelligibility, the combined result of her low vocal intensity, rapid rate of speech, and mild frontal lisp. (*Id.*)

Socially, the IEP described claimant as interacting well with adults and peers, but sometimes struggling to take responsibility for her actions, blaming others instead. (Tr.

243.) Claimant reported feeling badly about having been left back a grade, but did not appear to recognize her learning difficulties and did not ask for help when needed. (*Id.*) The IEP also noted that claimant's last asthmatic episode was in July 2009, and that she continued to wet the bed, although she was still treated for both conditions. (Tr. 244.)

D.S.P.'s 2010 IEP indicated improvement in all subject areas, although she still demonstrated difficulties in reading, writing and math. (Tr. 254.) The IEP reported that she was eager to learn and "demonstrate[d] the need to try very hard." (*Id.*) She was found to require a multi-modal approach to instruction with replication and simplification of information, as well as extra time to process information and complete tasks. (*Id.*) Continued support and encouragement was recommended, along with prompting and redirection. (Tr. 255.) She reported no mobility limitations or new medical conditions. (*Id.*) D.S.P. was again recommended for placement in a general education class with special education teacher support and pull-out speech therapy twice a week. (Tr. 254, 260-61.)

D. New York State Office of Temporary and Disability Assistance, Division of Disability Determinations Speech and Language Questionnaire

Claimant's speech therapist Leah Reznitsky completed a speech and language evaluation, dated November 30, 2010, for the Disability Determinations Division of the New York State Office

of Temporary and Disability Assistance.  (*See* Tr. 277-84.)

Ms. Reznitsky noted that D.S.P.'s speech required frequent

repetition to be understood by people familiar with her, and

that D.S.P. could be understood by unfamiliar listeners less

frequently.  (Tr. 278.)  She also reported that D.S.P.'s

intelligibility improved with repetition.  (*Id.*)  Ms. Richard

indicated that D.S.P.'s oral motor skills, voice quality, and

voice intensity were "within normal limits."  (*Id.*)  She

commented that claimant verbalized phrases, simple sentences,

and compound sentences, engaged in conversation freely, and

demonstrated moderate delays.  (Tr. 280.)  She reported that

D.S.P.'s pragmatic skills were age appropriate, and that she had

responded positively to speech therapy.  (*Id.*)

        Ms. Reznitsky noted that D.S.P. was able to comprehend

nouns, verbs, special relations, one-, two-, and three-step

directions, yes/no questions, either/or statements, if/then

statements, figurative language, stories, and conversations.

(Tr. 281.)  She also repeatedly referred to an annexed copy of

the October 2009 speech and language evaluation conducted by Ms.

Newman, discussed in detail above.  (*See* Tr. 281-84.)

        E. KCHC Behavioral Health Department Therapy Records

        On August 1, 2011, claimant was evaluated by the KCHC

Behavioral Health Department.  (*See* Tr. 486, 496.)  The

psychologist in training, Katharine Thomson, M.A., noted that

D.S.P. had difficulty controlling her emotions and had the
tendency to react impulsively when sad or angry.  (Tr. 486.)
D.S.P. also had trouble expressing herself, which frustrated her
further and subjected her to bullying from others.  (*Id.*) Ms.
Thomson also identified a difficulty with speech and language;
specifically, claimant's speech was difficult to comprehend at
times, due to low volume and poor articulation, and her response
time was delayed.  (*Id.*)  Ms. Thomson also noted that claimant
had a dental malformation for which she was likely stigmatized.
(Tr. 500.)

Claimant was admitted for psychotherapy the same day,
on August 1, 2011, with Ms. Thomson and the supervising
psychologist, Rachel Maldonado, Psy.D.  (Tr. 496; *see also* Tr.
500-501.)  Although claimant appeared "calm, smiley, and
cooperative" during her first session, she was reluctant to
answer questions and pointed to plaintiff to answer on her
behalf.  (*Id.*)  After considerable encouragement, D.S.P. began
to respond to some questions.  (*Id.*)  She reported feeling "mad
and sad" at times.  (*Id.*)  D.S.P. denied any suicidal or
homicidal ideations or audiovisual hallucinations.  (Tr. 500.)
Ms. Thomson described claimant's speech as logical but with
evidence of receptive or expressive delays.  (*Id.*)  She
estimated claimant's cognitive functioning to be in the below
average range.  (*Id.*)  When claimant was asked what she would do

with a wallet she found on the ground, she stated, "Ask if it was the person's walking by, if not, just leave it." (*Id.*) Ms. Thomson described claimant's insight as fair, but her judgment and impulse control as poor. (*Id.*) During the session, claimant listed her goals as "stop trying to hit people, stop cursing at people when I'm mad, be a singer, be brave and have more self confidence." (*Id.*) Ms. Thomson and Ms. Maldanado diagnosed claimant with mixed communication disorder and noted to rule out mixed receptive-expressive language disorder, depressive disorder (not otherwise specified), and mild mental retardation. (*See id.*)

Claimant and plaintiff had another therapy session on August 8, 2011, the focus of which was rapport building and goal identification for claimant's treatment plan. (Tr. 495.) Claimant was much more verbal than at her initial session and explained that she can take "a long time to figure out [her] words." (*Id.*) She was advised that she should not rush and should take time to think about her answers. (*Id.*) Claimant listed several triggers for her feelings of anger and frustration, including annoyance at her sister and mother, as well as students at school calling her "stupid" and "retarded" when she was unable to answer questions quickly. (*Id.*) Plaintiff expressed frustration at clamant throughout the session, leading claimant to become increasingly silent and non-

responsive. (*Id.*) Plaintiff expressed a concern that claimant did not tell her anything anymore. (*Id.*) Ms. Thomson provided plaintiff with psychoeducation pertaining to claimant's functioning and adolescent development. (*Id.*)

At her August 22, 2011 therapy session, claimant was highly verbal and eager to share stories of her recent whereabouts with Ms. Thomson. (Tr. 494.) Ms. Thomson observed that claimant's speech remained delayed with respect to articulation, but that the volume and rate of speech were within normal limits. Although claimant was initially engaged and talkative, she became considerably more reluctant to speak after plaintiff joined the session. (*Id.*) Ms. Thomson encouraged plaintiff to allow claimant adequate time and encouragement to share her thoughts and provide positive feedback to claimant. (*Id.*) Ms. Thomson outlined a comprehensive treatment plan that provided for weekly individual and family psychotherapy in order to improve claimant's emotional regulation and self-confidence to the point where her daily functioning is no longer significantly impacted. (Tr. 498.) On the treatment plan, she reported D.S.P's GAF[11] score of 55.[12] (Tr. 498.) She also

---

[11] The GAF (Global Assessment of Functioning) is an assessment indicating an individual's overall functioning level. Access Behavioral Health, *Global Assessment of Functioning*, https://www.omh.ny.gov/omhweb/childservice/mrt/global_assessment_functioning.pdf (last visited Jul. 29, 2015).

[12] A score of 55 indicates that an individual has "moderate symptoms" in social functioning. (*Id.*)

conducted a nutritional screening in which she recorded that claimant eats a lot and was on a diet after having gained ten pounds in two months. (Tr. 499.)

On August 30, 2011, Ms. Thomson spoke to claimant briefly while she was admitted to the PICU for high blood pressure, and claimant did not report any discomfort, sadness, or anxiety. (Tr. 493.) On September 12, 2011, claimant appeared quieter, sullen, and irritable, avoided eye contact, and responded to most questions with "I don't know." (Tr. 492.) She was unable to identify any positive or negative emotions or answer questions relating to her hospital stay or current treatment. (*Id.*) She was more responsive in writing. (*Id.*) When plaintiff joined the session, claimant remained quiet and reluctant to speak. (*Id.*) Plaintiff reported feeling exhausted due to her busy schedule as a result of school starting and claimant's medical treatment. (*Id.*) Plaintiff was encouraged to refrain from making critical comments to claimant. (*Id.*)

On October 3, 2011, claimant again appeared quiet, sullen, and irritable. (Tr. 490.) Ms. Thomson engaged claimant in silent play, but claimant remained listless and exhibited significant psychomotor retardation. (*Id.*) Responding to claimant's reluctance to speak, plaintiff repeatedly asked claimant what was wrong with her and why she was behaving strangely "all of a sudden." (*Id.*) After conversation with Ms.

Thomson, plaintiff disclosed that she had called claimant "retarded" on their way to the therapy session. (*Id.*) When asked how this made her feel, claimant began to cry and explained that she thought plaintiff thought she was stupid. (*Id.*) Ms. Thomson prompted plaintiff to provide positive feedback to claimant and urged her to refrain from calling claimant "retarded." (*Id.*)

On October 17, 2011, both plaintiff and claimant attended the entire therapy session with Ms. Thomson. (Tr. 488.) Claimant appeared more positive and cooperative than in prior sessions. (*Id.*) After reviewing claimant's IEP as a group, Ms. Thomson advised plaintiff to meet with claimant's new school to review her IEP and learn what was happening with claimant's education. (*Id.*) Because the tests in claimant's IEP were two years old, Ms. Thomson discussed with plaintiff the possibility of referring claimant to KCHC's Developmental Evaluation Clinic for testing and, with plaintiff's consent, scheduled an intake appointment. (*Id.*) Claimant's independence in her morning routine was discussed, and plaintiff and claimant agreed that claimant would brush her teeth, brush her hair, and apply deodorant daily. (*Id.*)

F. Consultative Child Intelligence Evaluation

Angela Fairweather, Ph.D., of Industrial Medicine Associates, P.C., conducted a consultative psychological

evaluation of claimant at the direction of the Disability
Determinations Division of the New York State Office of
Temporary and Disability Assistance on January 13, 2011. (Tr.
285-91.) Dr. Fairweather noted that claimant was in the fifth
grade at the time of her evaluation, with poor to fair academic
performance. (*Id.*) She also noted that claimant was in special
education classes due to a speech/language impairment and
received additional speech support services. (*Id.*)

Plaintiff reported an increase in claimant's appetite,
but denied any sleep problems. (*Id.*) Dr. Fairweather noted
that claimant displayed nocturnal enuresis. (*Id.*) She also
reported claimant's current functioning as failing to pay
attention to detail, making careless mistakes, and having
difficulty maintaining attention in tasks and play. (*Id.*)
Claimant also endorsed excessive apprehension and hypervigilance
but denied having psychotic symptoms. (*Id.*) Plaintiff told Dr.
Fairweather that claimant had been sexually molested at age 5 by
a neighbor. (Tr. 288.)

During her evaluation, Dr. Fairweather observed that
claimant's posture and motor behavior were normal, her eye
contact was fair, and her speech and language skills were age-
appropriate. (*Id.*) She characterized claimant as cooperative
and friendly, though she appeared nervous initially. (*Id.*) Dr.
Fairweather reported that claimant was able to recall and

25

understand instructions, and that her style of responding was deliberate and orderly. (*Id.*) She stated that D.S.P.'s attention and concentration levels were good. (*Id.*)

Dr. Fairweather gave D.S.P. the Wide Range Achievement Test (WRAT-III), a reading/decoding assessment, on which she scored an 85, or at a fourth-grade level. (*Id.*) On the Wechsler Intelligence Scale for Children (WISC-IV), a standardized intelligence measure, D.S.P.'s Full Scale IQ was measured at a 74 or 75, falling within the borderline range. (Tr. 289.) Dr. Fairweather noted that D.S.P.'s attention skills (low average), non-verbal/visual reasoning (low average), and ability to perform clerical-type tasks (average) were better than her acquired knowledge and verbal expression skills, which were in the extremely low range. (*Id.*) Due to claimant's extremely low to average performance on several skill assessments, Dr. Fairweather concluded that the Full Scale IQ score was "not the best measure of claimant's overall intellectual abilities." (*Id.*)

Dr. Fairweather further reported that claimant:

> exhibits mild difficulty asking questions and
> requesting assistance in an age appropriate manner,
> attending to, following, and understanding age
> appropriate directions, responding adequately to
> changes in the environment, and interacting adequately
> with peers and adults; and mild to moderate difficulty
> learning in accordance with cognitive functioning.

(Tr. 289-90.)  She concluded that her evaluation results were
consistent with psychiatric and cognitive problems that "may
cause moderate impairment in the claimant's ability to function
on a daily basis."  (Tr. 290.)  Dr. Fairweather diagnosed
claimant with a learning disorder (NOS, or not otherwise
specified), nocturnal enuresis, borderline to below-average
intellectual functioning, and asthma. (*Id.*)  She ruled out post-
traumatic stress disorder and recommended individual
psychotherapy, as well as continued placement in special
education classes with additional speech therapy.  (*See id.*)

    G. <u>Social Security Administration Consultative Childhood
       Disability Evaluation</u>

      On December 30, 2010 and January 26, 2011
respectively, upon request by the Social Security
Administration, M. Lieberman, a speech language pathologist, and
Dr. G. Shukla, a pediatrician, reviewed D.S.P.'s claims file and
completed a Childhood Disability Evaluation Form.  (*See* Tr. 307-
12.)  The consultants found that D.S.P. had a severe impairment
or combination of impairments[13] that, nevertheless, did not meet,
medically equal, or functionally equal the listings.  (Tr. 307.)
In the domains of attending and completing tasks, moving about
and manipulating objects, and caring for herself, the

---

[13] The impairments identified were not-otherwise-specified learning disorder,
borderline intellectual functioning, and asthma.  (Tr. 307.)

consultants found that D.S.P. did not suffer from any limitation. (Tr. 309-10.)

In the acquiring and using information domain, the consultants found a marked limitation and noted that D.S.P. had moderate delays in receiving and expressing language and decreased verbal and comprehension skills. (*Id.*) They also referred to an examining source who had determined that D.S.P. had mild to moderate difficulty learning in accordance with cognitive functioning. (*Id.*) In the interacting and relating with others domain, the consultants found a less than marked limitation, pointing to records of claimant's decreased speech intelligibility. (*Id.*) In the health and physical well-being domain, the physicians found a less than marked limitation due to her mild but persistent asthma. (*Id.*) Although the consultants indicated their ultimate disposition on the form (*see* Tr. 307), they did not check off any of the options in the conclusions section of the form. (*See* Tr. 311.)

H. Social Security Administration Teacher Questionnaire

On March 7, 2012, D.S.P.'s 6th grade Social Studies teacher Ms. Bailey completed a teacher questionnaire evaluation of D.S.P.'s functioning in school at the request of the Social Security Administration. (*See* Tr. 179, 181-88.) The scope of the evaluation covered the child's day-to-day functioning in school, including the six domains of "Acquiring and Using Information,"

"Attending and Completing Tasks," "Interacting and Relating with Others," "Moving about and Manipulating Objects," "Caring for Himself or Herself," and "Medical Conditions and Medications/Health and Physical Well-Being." (Tr. 179.) At the time of the evaluation, Ms. Bailey had known claimant for seven months, during which time she saw claimant four times per week. (Tr. 181.) Ms. Bailey also noted that claimant received speech services. (*Id.*)

Regarding acquiring and using information, Ms. Bailey checked the box indicating that claimant had no problems, but proceeded to complete the rating for each activity listed.[14] (Tr. 182.) Ms. Bailey indicated that D.S.P. had an obvious problem with comprehending and doing math problems, learning new material, and recalling and applying previously learned material; a serious problem with comprehending oral instructions, understanding school and content vocabulary, reading and comprehending written material, understanding and participating in class discussions, and expressing ideas in written form; and a very serious problem with providing organized oral explanations and adequate descriptions and applying problem-solving skills in class discussions. (*Id.*) Elaborating, Ms. Bailey wrote:

---

[14] A number of the initial checkmark responses to the questionnaire were crossed out and changed to a different rating. (Tr. 182-84.) Neither the reasons for nor the person making the changes were identified.

> At times [claimant] needs help with completing
> activities – writing.  Difficult to understand new
> concepts.  She also has a lot of difficulty with
> verbal expression.  She attempts to participate when
> she can, but answers with great difficulty.

(Tr. 182.)

Regarding attending and completing tasks, Ms. Bailey indicated that D.S.P. had problems functioning on a weekly basis.  (Tr. 183.)  Specifically, she indicated that claimant had a slight problem paying attention when spoken to directly, refocusing to task when necessary, organizing her belongings or school materials, and completing assignments; and an obvious problem carrying out multi-step instructions, completing work accurately without careless mistakes, and working at a reasonable pace/finishing on time.  (*Id.*)  Claimant had no problem focusing long enough to finish the task at hand, carrying out single-step instructions, waiting to take turns, changing from one activity to another without being distruptive, or working without distracting herself or others.  (*Id.*)  Ms. Bailey explained that:

> [D.S.P.] attempts to complete class activities
> independently, and likes to show that she can work on
> her own.  If her work is incorrect, she is not
> resistant to receiving help.  At times she attempts to
> come across as she understands, but many times does
> not.  She requires structuring and timed activities to
> boost productivity.

(*Id.*)

Regarding interacting and relating with others, Ms. Bailey checked the box indicating that claimant had no problems and exhibited age-appropriate functioning in this domain; she also reported that it had not been necessary to implement behavior modification strategies for claimant. (Tr. 184.) She also completed the rating checklist provided, in which she indicated that claimant had a slight problem following rules and interpreting facial expressions, body language, hints, and sarcasm; an obvious problem relating experiences and telling stories; and a serious problem using situationally-appropriate language, introducing and maintaining appropriate topics of conversation, and using adequate grammar and vocabulary to express herself. (*Id.*) Each of these problems were reported as occurring daily. (*Id.*) Finally, Ms. Bailey reported that, although she could understand D.S.P.'s speech almost all of the time as a familiar listener after repetition/rephrasing, she could only understand half of D.S.P.'s speech on the first attempt when the topic was unknown, and half to one-third when the topic was known. (*Id.*)

Ms. Bailey wrote that claimant did not demonstrate any difficulty in the domain of moving about and manipulating objects. Regarding claimant's ability to care for herself, Ms. Bailey noted slight problems with handling frustration appropriate, being patient, and knowing when to ask for help;

and an obvious problem with cooperating in taking needed medications, each of which occurred with daily frequency. (Tr. 186.)  As to claimant's medical and physical well-being, Ms. Bailey noted that D.S.P had asthma, high blood pressure, and incontinence, each of which were medicated, and that she frequently missed school in order to see the doctor.  (Tr. 187.) As additional comments, Ms. Bailey wrote that D.S.P "has language comprehension and processing delays that affect her academics. Her medical needs also affect academics and attendance at school."  (Tr. 188.)

## IV.  Procedural History

Plaintiff filed an application for SSI benefits on behalf of D.S.P. on October 22, 2010, alleging that D.S.P. had been disabled since the day she was born, January 31, 1999. (Tr. 130.)  The Commissioner denied D.S.P.'s claim on January 26, 2011.  (Tr. 57-61.)  Plaintiff then requested a hearing, which was held before Administrative Law Judge Valorie Stefanelli (the "ALJ") on October 6, 2011. (Tr. 8, 63.)  At the hearing, plaintiff appeared without the assistance of counsel and testified on behalf of claimant. (Tr. 8, 113.)  The ALJ also heard limited testimony from claimant.  (Tr. 42-48.)

On April 13, 2012, the ALJ issued a decision in which she concluded that D.S.P. was not disabled within the definition of the Act.  (Tr. 5-7, 9 (citing 20 C.F.R. § 416.924(a)).)

Performing the three-step evaluation process for determining
whether an individual under the age of 18 is disabled, 20 C.F.R.
§ 416.924, discussed further below, the ALJ first found that
D.S.P. had not engaged in substantial gainful activity since the
date of her application.  (Tr. 11.)  Second, the ALJ found that
D.S.P.'s asthma, learning disorder, and speech delay were
severe, medically-determinable impairments that caused more than
minimal functional limitations.[15]  (*Id.*)  At the third step,
however, the ALJ determined that D.S.P.'s impairments did not
meet, medically equal, or functionally equal the severity of one
of the listed impairments set forth in Appendix I to Subpart P
of Part 404 of the Regulations.  (Tr. 12.)

In determining that D.S.P.'s impairments did not
functionally equal any listed impairment, the ALJ evaluated
D.S.P.'s degree of limitation in the six domains set forth in 20
C.F.R. § 416.926a(b) after considering all of the relevant
evidence in the case record.  (*Id.*)  After considering
claimant's symptoms, the ALJ determined that claimant and
plaintiff's statements regarding the intensity, persistence, and
limiting effects of the symptoms were not credible to the extent
they were inconsistent with the ALJ's finding that claimant's
impairments did not functionally equal a listing.  (*Id.*)

---

[15] The ALJ also noted that D.S.P. had a non-severe impairment, hypertension.
(*Id.*)

The ALJ found that D.S.P. had a marked limitation in the domain of acquiring and using information. (Tr. 14.) She wrote that her finding was supported by "Exhibit 11E, page 4; Exhibit 19F, pages 10, 13; Exhibit 18F, pages 7, 38, 132; Exhibit 10F, page 3; Exhibit 6F, pages 3-4; [and] Exhibit 3F, pages 22-23." (*Id.*) The decision did not explain how the cited documents supported the ALJ's determination or mention conflicting evidence in the record.

In the domain of attending and completing tasks, the ALJ found a less than marked limitation. (Tr. 15.) She indicated that the finding was supported by Exhibit 19F, page 13, because Ms. Thomson, claimant's therapist, had noted that claimant's "attention and concentration appear[ed] within normal limits"; Exhibit 6F, page 3, because Dr. Fairweather, the state consultant, had found that claimant could "complete age appropriate tasks"; Exhibit 11E, page 5, because Ms. Bailey had indicated that claimant's limitation in this area was less than marked; and Exhibit 10F,[16] page 3. (*Id.*)

The ALJ found a less than marked limitation in the domain of interacting and relating with others. (Tr. 16.) She indicated that the finding was supported by Exhibit 19F, page 11, because Ms. Thomson had noted that claimant "enjoys singing

---

[16] The Childhood Disability Evaluation Form completed by the medical consultants after review of claimant's file.

34

and music.  She is eager to learn, enjoys spending time with her friends. . ."; Exhibit 6F, page 3, because Dr. Fairweather had written that claimant's interests included "playing with friends, surfing the Internet and singing"; Exhibit 11E, page 5, because Ms. Bailey had reported no problems in this domain; Exhibit 10F, page 3; Exhibit 3F,[17] pages 4 and 20; and Exhibit 2F,[18] page 5.  (*Id.*)

In finding no limitation in the domain of moving about and manipulating objects, the ALJ cited Exhibit 19F, page 13, because Ms. Thomson had noted that claimant enjoyed basketball; Exhibit 11E, page 7, because Ms. Bailey had reported no limitations in this domain; and Exhibit 10F, page 4.  (Tr. 18.) Neither did the ALJ find a limitation in the area of D.S.P.'s ability to care for herself, citing Exhibit 11E, page 8 and Exhibit 10F, page 4.  (Tr. 19.)

Finally, the ALJ found a less than marked limitation in the area of health and physical well-being, which she concluded from Exhibit 14F, pages 1, 3, and 6, in which D.S.P.'s treating physician, Dr. Browne, characterized D.S.P.'s asthma as moderate and not limiting her ability to function; Exhibit 4F, in which an examining speech therapist found that claimant's speech delay was moderate; Exhibit 10F, page 4; and Exhibit 3F,

---

[17] Claimant's 2010 IEP, including Speech Evaluation by Ms. Newman and Psycho-Educational Evaluation by Ms. Gantz.

[18] Claimant's 2009 IEP.

page 5. (Tr. 19-20.) Because the ALJ did not find either a "marked" limitation in two domains of functioning or an "extreme" limitation in one domain of functioning, the ALJ determined that D.S.P was not disabled as defined under the Act. (Tr. 20.)

On April 13, 2012, plaintiff sought review of the ALJ's decision by the Appeals Council. (Tr. 1.) On February 25, 2013, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review. (*See* Tr. 1-3.) Plaintiff, appearing *pro se*, filed this complaint on April 19, 2013. Plaintiff later retained counsel, who entered a notice of appearance on September 9, 2013.

On September 16, 2013, defendant served plaintiff with its motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (*See* Def. Mem.) Plaintiff's counsel subsequently served defendant with plaintiff's motion for judgment on the pleadings on November 8, 2013. (*See* Pl. Mem.) Plaintiff argues that the ALJ's decision was erroneous because the ALJ (1) failed to state the weight accorded to the evidence, (2) failed to make a proper credibility determination regarding plaintiff's testimony, and (3) failed to support her determination that claimant was not disabled with substantial evidence. (Pl. Mem. at 1.) Defendant argues that the ALJ

correctly applied the legal standards and that the Commissioner's decision is supported by substantial evidence. (Def. Mem. at 1.)

**DISCUSSION**

## I.  Standard of Review

A district court reviews the Commissioner's decision to "determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) (citing *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002)). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "A district court may set aside the [ALJ's] determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal citations and quotation marks omitted).

In order to assess the legal standards and evidentiary support used by the ALJ in his disability finding, the reviewing court must be certain that the ALJ considered all the evidence. *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y.

2004); *see Carnevale v. Gardner*, 393 F.2d 889, 891 (2d Cir. 1968) ("We cannot fulfill the duty entrusted to us, that of determining whether the Hearing Examiner's decision is in accordance with the Act, if we cannot be sure that he considered some of the more important evidence presented[.]"). An evaluation of the "substantiality of evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988.)

After reviewing the Commissioner's determination, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." *Butts*, 388 F.3d at 384 (quoting 42 U.S.C. § 405(g)). "Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision." *Grace v. Astrue*, No. 11-cv-9162, 2013 WL 4010271, at *14 (S.D.N.Y. July 31, 2013) (citing *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

## II.  Requirements for SSI Eligibility

An individual under the age of eighteen is considered disabled under the Act if she has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i); *Kittles ex rel. Lawton v. Barnhart*, 245 F. Supp. 2d 479, 487 (E.D.N.Y. 2003).  Further, although not in dispute in this case, an individual under the age of eighteen who "engages in substantial gainful activity" is not eligible for SSI benefits.  42 U.S.C. § 1382c(a)(3)(C)(ii).

In order for a claimant under the age of eighteen to be found disabled, the Act requires an ALJ to conduct a three-step sequential analysis finding each of the following: (1) that the claimant is not engaged in substantial gainful activity; (2) that the claimant has a medically determinable impairment or a combination of impairments that is "severe" (i.e., the impairment or combination of impairments cause more than a minimal functional limitation); and (3) that the impairment or combination of impairments meets or equals a disabling condition identified in the listing of impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1 (a "listed impairment").  *See Jones ex rel. T.J. v. Astrue*, No. 07-CV-4886, 2010 WL 1049283, at *5 (E.D.N.Y. Mar. 17, 2010); *Kittles*, 245 F. Supp. 2d at 488; 20 C.F.R. § 416.924(b)-(d).  Equivalence to a listed impairment may be medical or functional.  *See Jones ex rel. T.J.*, 2010 WL 1049283, at *5; *Kittles*, 245 F.Supp.2d at 488; 20 C.F.R. § 416.924(d).

Analysis of functional equivalence requires the ALJ to

39

assess the claimant's functional ability in six main areas referred to as "domains." 20 C.F.R. § 416.926a(b)(1). The six domains—(i) acquiring and using information, (ii) attending and completing tasks, (iii) interacting and relating with others, (iv) moving about and manipulating objects, (v) caring for oneself, (vi) health and physical well-being--are "broad areas of functioning intended to capture all of what a child can or cannot do." *Id.* Functional equivalence is established when the ALJ finds that the claimant has a "marked limitation" in two domains or an "extreme limitation" in one domain. 20 C.F.R. § 416.926a(a).

A "marked limitation" is one that "seriously interferes" with a claimant's ability to initiate, sustain, and complete activities. 20 C.F.R. § 416.926a(e)(2). It is "more than moderate, but less than extreme." *Id.* In addition, the rgulations further describe a "marked limitation" as what would be expected with the equivalent of two standard deviations below the mean on standardized testing. 20 C.F.R. § 416.926a(e)(2) (iii). "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis." *Jones*, 2010 WL 1049283,

at *6 (quoting 20 C.F.R. Pt. 404, Subpart P, App. 1, §
112.00(C)).

An "extreme limitation" is one that "very seriously
interferes" with a claimant's ability to independently initiate,
sustain, and complete activities.  20 C.F.R. § 416.926a(e)(3).
It is designated for the "worst limitations...but does not
necessarily mean a total lack or loss of ability to function."
*Id.*  The regulations describe an "extreme limitation" as what
would be expected with the equivalent of three standard
deviations below the mean on standardized testing.  20 C.F.R. §
416.926a(e)(3)(i), (iii).

## III. Application

### A. Failure to Adequately Consider the Record

Plaintiff argues that the ALJ did not explain the
weight given to any of the limited evidence she cited to support
her functional equivalence determination, particularly in the
case of claimant's teacher Ms. Bailey, from whose report the ALJ
arbitrarily cited statements in support of her determination
without explanation of why they were more probative than other
findings in Ms. Bailey's report.  (Pl. Mem. at 13-18.)  Remand
is appropriate because the court finds that the ALJ did not
adequately explain her reasoning.

The ALJ may not "pick and choose" from the transcript
only such evidence that supports her decision.  *Sutherland*, 322

F. Supp. 2d at 289.  In her decision as to whether claimant's impairments functionally equaled a listed impairment, the ALJ merely cited several exhibits that supported her determination with little to no explanation of their content or how those documents would support or detract from her conclusion.

In the domain of acquiring and using information, the ALJ noted that her finding of a marked limitation was supported by Exhibits 11E, 19F, 18F, 10F, 6F, and 3F without explaining the link between those exhibits and her determination.  In Exhibit 11E, the questionnaire completed by Ms. Bailey, claimant's sixth grade Social Studies teacher, Ms. Bailey indicated that claimant had a "very serious problem" with providing organized oral explanations and adequate descriptions and applying problem-solving skills in class discussions, and a "serious problem" with comprehending oral instructions, understanding school and content vocabulary, reading and comprehending written material, understanding and participating in class discussions, and expressing ideas in written form. Without any reasoning provided in the ALJ's decision, it is unclear why this document would support a finding of a marked limitation (or, a "serious problem") in this domain rather than an extreme limitation (or, a "very serious problem").[19]

---

[19] The Commissioner notes in her memorandum of law that certain responses on the checklist were crossed out and replaced with new responses.  (*See* Def. Mem. at 19 ("it that [*sic*] appears that someone changed the responses that

Similarly, the ALJ cites to the admission note and treatment plan completed by Katharine Thomson, the psychologist-in-training at the KCHC Behavioral Health Department without reference to the facts that support the ALJ's finding and why those facts were the most probative of the fourteen pages of therapy session notes.

The ALJ's reasoning for her findings in the domains of attending and completing tasks and interacting and relating to others is similarly deficient. As to attending and completing tasks, the ALJ cites a finding in the state consultant, Dr. Fairweather's, report that claimant "is able to complete age appropriate tasks. . ." but does not address statements from plaintiff that claimant fails to pay attention to detail, makes careless mistakes, and has difficulty sustaining attention in tasks and play. Although the ALJ may choose to credit a consultative examiner's finding over other evidence, this court is unable to decipher her reasons for doing so from the decision.

In finding claimant to have a less than marked limitation in the domain of interacting and relating to others, the ALJ cited Ms. Bailey's finding that D.S.P. had no problems

---

were checked off").) The ALJ does not explain in her decision, however, whether she refused to consider the responses to the questionnaire where one answer had been crossed out and replaced with another. Without any explanation, the court is unable to determine which, if any, responses the ALJ credited and considered in her decision.

in regard to social interaction.  Although Ms. Bailey checked

off the box indicating that claimant had no problems in this

domain, she completed the checklist for rating claimant's

problems and found her to have a "serious problem" using

language appropriate to the situation and listener, introducing

and maintaining relevant and appropriate topics of conversation,

and using adequate vocabulary and grammar to express thoughts in

everyday conversation.  She also indicated that she, as a

familiar listener, could understand no more than half of

claimant's speech when the conversation topic was unknown and

one-half to one-third when the topic was known.  Thus, the ALJ's

citation to the record is not wholly accurate and, without

further analysis of the evidence supporting her finding, does

not adequately explain her conclusion.

By highlighting these issues, the court does not

intend to supplant its analysis of the record for the ALJ's.

Although the district court should not engage in weighing the

credibility of evidence in the record or review *de novo* the

ALJ's disability determination, however, the district court must

ensure that the ALJ has satisfied her legal duty.  *Sutherland*,

322 F. Supp. 2d at 289.  There is ample evidence from the record

as to D.S.P.'s learning disability, speech impairment, and

asthma, including test scores, reports from treatment providers,

and statements from D.S.P. and her mother.  Although the ALJ

explained in detail the applicable statutory and regulatory standards, she failed to apply these standards to evidence of D.S.P.'s impairments with any specificity. *See Rivera v. Astrue*, No. 10-cv-4324, 2012 WL 3614323, at *11-12 (E.D.N.Y. Aug. 21, 2012). Accordingly, on remand, the ALJ must justify her determination that claimant's impairments do not entitle her to benefits with sufficient specificity to permit a reviewing court to review such justification.

B. Failure to Adequately Analyze Credibility of Plaintiff's Statements Regarding D.S.P.'s Symptoms

Social Security regulations require an ALJ to consider a claimant's subjective testimony regarding her symptoms in determining whether she is disabled. *See* 20 C.F.R. § 404.1529(a). In evaluating this testimony, the ALJ must follow a two-step process. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to cause the symptoms alleged. *Id.* Second, the ALJ must determine "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*

If, at step two, a claimant's subjective evidence of her symptoms is supported by objective medical evidence, it is

entitled to "great weight." *Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) (internal quotation marks omitted). If a claimant's symptoms suggest a greater severity of impairment than can be demonstrated by the objective medical evidence, however, "the ALJ must engage in a credibility inquiry." *Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010) (summary order) (citing 20 C.F.R. § 404.1529(c)(3)). The ALJ specifically must consider additional factors including daily activities, the location, duration, frequency and intensity of symptoms, the type, effectiveness and side effects of medication, and other treatment or measures to relieve those symptoms. 20 C.F.R. § 404.1529(c)(3).

The ALJ may accept or reject testimony of a claimant's parent.[20] *Williams,* 859 F.2d at 260. Nevertheless, a finding that a witness is not credible must be set forth with sufficient specificity to permit intelligible review of the record. *Id.* (citing *Carroll v. Sec'y of Health and Human Servs.,* 705 F.2d 638, 643 (2d Cir. 1983)). Where a parent testifies as to the child claimant's symptoms, the ALJ must make specific findings concerning the credibility of the parent's testimony, just as if the child were testifying. *Williams*, 859 F.2d at 260 (internal citation omitted).

---

[20] If the claimant is under 18 and unable to describe adequately her symptoms, the ALJ must accept the description provided by the person most familiar with the child's condition, such as a parent or guardian. 20 C.F.R. § 928(a).

Here, after considering the record, the ALJ concluded that "the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms," but that "the statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with finding that the claimant does not have an impairment or combination of impairments that functionally equals the listings for the reasons explained below." (Tr. 13.)

Although the ALJ's use of boilerplate language need not invalidate the credibility assessment, her failure to make any reference to or explain her analysis of particular evidence in the record, refer to the credibility analysis factors, or give clear and specific reasons for her credibility findings necessitate further proceedings. An ALJ's finding that a claimant, or here, her representative, is not credible must refer to facts in the record and "be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Escalante v. Astrue*, No. 11-cv-375, 2012 WL 13936, at *8 (S.D.N.Y. Jan. 4, 2012) (citing Soc. Sec. Ruling 96-7p, 61 Fed. Reg. 34,483, 34,484 (Jul. 2, 1996)).

At the hearing, plaintiff provided testimony as to D.S.P.'s problems with articulating words, answering questions,

engaging in conversation and fighting with classmates and siblings.  Without any reference to that testimony or potentially contradictory evidence in the record, the court is precluded from understanding the basis for the ALJ's credibility finding, and remand is appropriate for further findings or a clearer explanation of the ALJ's decision.  *Pratts*, 94 F.3d at 39.  On remand, the ALJ shall assess plaintiff's credibility in light of all evidence in the record and provide clear, specific reasons for the credibility assigned to plaintiff's statements regarding the intensity, persistence, and limiting effects of claimant's symptoms.

## C. Substantial Evidence Review

As noted above, the Commissioner argues only that her decision is supported by substantial evidence and therefore should be upheld.  (*See generally* Def. Mem.)  Consideration of whether the Commissioner's disability determination is supported by substantial evidence is improper where remand is warranted due to the ALJ's failure to consider certain evidence or apply the law properly in assessing the evidence.  *See, e.g., Lebron v. Colvin*, No. 13-CV-9140, 2015 WL 1223868, at *23 (S.D.N.Y. Mar. 16, 2015).  Accordingly, the court does not reach the issue of whether the ALJ's decision was supported by substantial evidence here.

## CONCLUSION

For the reasons set forth above, the court denies the defendant's motion for judgment on the pleadings, denies in part plaintiff's motion to the extent it seeks remand solely for the calculation of benefits, and grants plaintiff's motion to remand this case for further proceedings consistent with this opinion. On remand, the ALJ shall:

(1) Explain in specific detail the basis for a determination, if warranted, that claimant's impairments are insufficient to entitle her to benefits at the third step of the disability determination;

(2) Specifically address plaintiff's testimony regarding D.S.P.'s functioning in each of the six domains and assess that testimony pursuant to 20 C.F.R. §§ 416.928(a) and 416.929(c).

The Clerk of the Court is respectfully requested to close this case.

**SO ORDERED.**

Dated:     July 29, 2015
           Brooklyn, New York

_____/s/_____
KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York